**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 30, 2019**

# In the Court of Appeals of Georgia

A19A0881. BATES v. HOWELL.

REESE, Judge.

Philip A. Bates, as the trustee of the Anne S. Florance Revocable Trust ("Trust"), appeals from the trial court's grant of summary judgment to Emily Howell on Bates's wrongful restraint claim for monetary damages that allegedly arose as a result of temporary restraining orders ("TROs") obtained by Howell. Bates contends that the trial court erred in finding, as a matter of law, that the TROs did not constitute a wrongful restraint. Bates argues, inter alia, that Howell lacked the authority to obtain the TROs, that the TROs improperly prevented him from performing his required duties as trustee under the Trust, and that Howell was liable for the damages to the Trust that arose from the wrongful restraint. For the reasons

set forth infra, we reverse the trial court's order and remand this case for further proceedings consistent with this opinion.

The record shows the following, undisputed facts.[1] Bates served as an attorney for Anne S. Florance ("decedent") from 1996 until the decedent's death on May 14, 2013.[2] In February 2013, the decedent executed three legally distinct and independent documents: a "Last Will and Testament" ("Will"); a revocable, inter vivos Trust; and an "Assignment[.]"[3] In her Will, the decedent nominated Bates as the executor and provided that, upon her death, all of her tangible and intangible assets (except enough funds to pay taxes, final administrative expenses, and the remaining outstanding expenses of the estate) poured over into the Trust.[4] The Will did not provide for any assets to be distributed to any beneficiaries except the Trust.

---

[1] This Court's opinion in a related appeal, *Howell v. Bates*, provides additional information about the controversy between the parties. 350 Ga. App. 708 (830 SE2d 250) (2019).

[2] *Howell*, 350 Ga. App. at 708-709.

[3] Id. at 708.

[4] See id.

2

The Trust provided that the decedent was to serve as trustee until her incapacity or death, at which time Bates was to take over as trustee.[5] The Trust provided for the distribution of assets to several named beneficiaries, including $25,000 to her niece, Howell,[6] after the decedent's death, and provided that, upon distribution of the Trust's assets to all of the named beneficiaries, the trustee was to distribute the remaining assets to three charities ("charitable remainder beneficiaries").

Finally, in the Assignment, the decedent immediately and irrevocably transferred all of her assets that existed at the time of the Assignment's execution (February 20, 2013) to the Trust. Thus, the decedent's only assets at the time of her death on May 14, 2013, were those that she had acquired in the two to three months since she had executed the Assignment. And, pursuant to the Will, those newly acquired assets were then automatically transferred to the Trust at the time of the decedent's death.[7] Consequently, the decedent's estate contained no distributable assets after May 14, 2013.[8]

---

[5] See *Howell*, 350 Ga. App. at 708.

[6] See id. at 709-710.

[7] See *Howell*, 350 Ga. App. at 708-709.

[8] See id. at 709.

For three and a half years, from the decedent's death in May 2013 until Bates filed the instant declaratory judgment petition in November 2016, Bates, as trustee, managed the Trust's assets pursuant to the terms of the Trust, which authorized him, inter alia, to sell the Trust's real and personal property, invest its assets, borrow or lend money, hire accountants and other agents, litigate claims involving the Trust, execute documents, and pay bills and fees, as necessary. Bates also made distributions of the Trust's assets to the Trust's beneficiaries, as directed by the Trust. Throughout that period, Howell never challenged the validity of the Trust, Bates's qualifications to serve as trustee of the Trust, or anything that Bates had done in his capacity as trustee, nor did she challenge the validity of the Assignment, which had irrevocably transferred most of the decedent's assets to the Trust prior to the decedent's death.

However, in January 2016, Howell filed a petition in the Probate Court of Fulton County ("probate court proceeding"), asserting that the decedent had died without a valid will and asking the court to appoint her as administrator of the decedent's estate.[9] In addition, in response to Bates's petition to probate the decedent's Will, Howell filed a caveat challenging the validity of the Will and Bates's

[9] See *Howell*, 350 Ga. App. at 710.

4

qualifications and ability to serve as executor of the Will.[10] Specifically, Howell asserted that the decedent's estate may have claims against Bates for, inter alia, legal malpractice, breach of trust, conversion, fraud, and undue influence, based on alleged conduct by Bates toward the decedent prior to her death.[11] However, Howell's caveat did not assert any claims against the Trust or Bates in his capacity as trustee. The probate court proceeding was still pending in August 2016.[12]

In August 2016, the most valuable remaining asset of the Trust was the decedent's Atlanta home ("Atlanta residence"). After almost three years of trying to sell the Atlanta residence, Bates contracted to sell it to a third party for $5.5 million, and the closing of the sale was scheduled for noon on August 29, 2016.

About two hours before the scheduled closing, however, Howell filed an ex parte petition for a TRO against Bates that stopped the closing from proceeding as scheduled. In her petition, Howell asserted that, in her capacity as the "Proposed Administrator of the Estate of [the decedent,]" she had "a property right or at least a protectable right" in the proceeds of Bates's imminent sale of the Atlanta residence.

_____

[10] See id.

[11] See id. at 710, 712 (1).

[12] See id. at 711 (1).

5

According to the petition, Howell "belie[ved]" that Bates intended to "immediately transfer [the sale proceeds] to the beneficiaries under the terms of the Trust[,]"[13] which would place the estate "at great financial risk, liability and damage and which would further irreparably damage the [e]state's ability to pay the [estate's] remaining beneficiaries."[14] Howell asserted that

> a substantial controversy [exists] between the parties [that] is currently in litigation in the [p]robate [c]ourt[,] and because there are significant issues alleged as to the ethical conduct of [Bates], the Trust property should not be distributed at this time[,] as to do so would destroy the status quo of the controversy before a full hearing can be had on the merits of the case [in the probate court]."

Therefore, the petition asked the court to enjoin Bates

---

[13] Howell's petition also asserted that Howell had "no knowledge as to the value of the [e]state property," and was "unaware whether Federal Estate taxes had been paid[,]" whether "Federal Estate Tax returns have been prepared[,]" "whether the [e]state owe[d] attorney fees or taxes[,]" and whether the estate had any "additional contingent liabilities[.]" Pretermitting whether Howell was entitled to such information, as she was not the administrator of the estate nor the executor or a beneficiary of the Will, Howell has failed to explain why the Trust would be liable for such expenses of the estate.

[14] As shown above, however, the only "beneficiary" under the Will was the Trust, to which all of the decedent's remaining assets (after payment of taxes and other outstanding expenses) were transferred upon her death.

from disbursing from the Trust or any other account any real or personal property including the proceeds or funds from the sale of the [Atlanta residence] or any other real or personal property to any [T]rust beneficiary, beneficiary, charity or third party named in [the decedent's] Will or Trust until [Howell could] be heard on [the above matters].

At some time between the 10:00 a.m. filing of the petition and the 12:00 noon closing the same day, a Fulton County judge granted Howell's petition, acknowledging that the petition was filed "without notice to [Bates]," but stating that Howell's counsel, Kevin Moore, had "certified the efforts that [had] been made to give [prior] notice to [Bates.]" The ex parte TRO issued by the judge prevented Bates from distributing or disbursing *any* "property, money or assets" from the Trust, including the proceeds from the sale of the residence, until further order of the court. Consequently, the TRO prevented Bates from using the proceeds of the sale to pay any closing costs, such as broker's fees, title insurance costs, attorney fees, etc., at the closing. According to Bates, the TRO also "effectively prohibited all Trust administration and immediately put the Trust at risk of violating its terms."

At 12:10 p.m. the same day, Howell's counsel, Moore, e-mailed a copy of the signed and filed TRO to Bates's counsel, Henry Chalmers.[15] However, Chalmers had already been notified of the TRO by the closing attorney, to whom someone had sent the TRO; the title insurance underwriter had already received the TRO, also. Based on the TRO's complete restriction on the disbursement of the sale proceeds, the closing attorney and underwriter refused to proceed with the closing unless the TRO was immediately dissolved or revised, expressing their concern about whether Bates would be able to use the proceeds from the sale to pay customary closing expenses. Chalmers also expressed concern about whether invoices from his law firm would be paid during the pendency of the TRO. As a consequence, the August 29 closing was rescheduled for August 31.

At some point thereafter, Moore promised Chalmers that he would obtain a revised TRO that would allow the closing to take place on August 31. Between that time and the morning of August 31, Chalmers repeatedly e-mailed Moore to find out

---

[15] Moore has offered no explanation as to why he did not e-mail or fax the TRO petition or proposed TRO to Chalmers *before* it was signed by the judge, which would have provided the requisite statutory notice and allowed Chalmers to forward the document to the proper attorney, if necessary. See OCGA § 9-11-65 (a) ("No interlocutory injunction shall be issued without notice to the adverse party."); see also Division 2, infra.

when the TRO would be revised and signed. In the e-mails, Chalmers notified Moore that the TRO had already caused the Trust to incur additional costs and other harm and had jeopardized the sale of the residence, emphasizing that the closing had to occur on August 31 "or the entire sale will be jeopardized." In fact, one of Chalmers's e-mails to Moore included this specific warning: "Please understand that we will hold . . . Howell responsible for all damages and harm caused by her improper ex parte TRO." Another e-mail to Moore, sent by Chalmers at 11:59 a.m. on August 31 (the day of the rescheduled closing), expressed shock at the fact that Moore still had not obtained a revised TRO and warned him that, "[i]f the sale does not close, as now appears ever more likely, it will be due to . . . Howell's improper TRO, for which she will be responsible to the Trust and to the Trust's charitable remainder beneficiaries." Later that day, Bates filed an emergency motion to dissolve Howell's ex parte TRO. In his motion, Bates expressly "reserve[d] all rights to recover actual damages associated [with the] improper action by [Howell]."

Finally, at 4:15 p.m. on August 31, Moore e-mailed a proposed, revised TRO to the judge who had signed the first one, and the judge signed the order ("Revised TRO"). The Revised TRO allowed the closing to proceed and provided that the sale proceeds could be used to pay the "customary expenses related to the sale of the

9

property[ ]" and other specified expenses. However, the Revised TRO required the net sale proceeds to be paid into the registry of the court within ten business days of the closing, and it prevented Bates from using *any* of the proceeds in the registry or other Trust assets to pay himself (as trustee) *or any third party*, or to make a distribution to any beneficiary, until further order of the court. Despite the language in the Revised TRO that purportedly allowed the August 31 closing to proceed, the closing attorney and title insurer still refused to close the sale with it in place.

In order to mitigate the accruing monetary damages arising from Howell's TROs, to ensure that the sale of the Atlanta residence closed, and to allow Bates to fulfill his administrative duties under the Trust, Bates agreed to another revised TRO (the "Stipulated TRO"), which the trial court signed on September 6. The Stipulated TRO expressly affirmed that Bates, as the trustee, had the power under the Trust to convey the Atlanta residence to the purchasers, and it allowed the closing to proceed "without restriction or limitation." The Stipulated TRO also vacated and dissolved the previous TROs, thereby eliminating the requirement that Bates pay the sale proceeds into the registry of the court after the closing. The Stipulated TRO also specifically stated that it was "not intended to and [did] not restrict in any way . . . the ordinary and day-to-day administration of the Trust," including taking steps to protect

10

the Trust's assets, negotiating and completing loan workouts, and paying "all customary expenses of the Trust administration," including, inter alia, administrative fees, commissions, professional service fees, attorney fees, security fees, and payroll expenses. The only express restrictions in the Stipulated TRO prohibited Bates from distributing any money from the Trust to any beneficiary, from paying himself any trustee fees, and from paying himself or his law firm any legal fees during the pendency of the order. As a result of the Stipulated TRO, the sale of the Atlanta residence closed on September 6, 2016.

On November 10, 2016, Bates, "[i]n his role as Trustee and for the ultimate benefit of the Trust's charitable remainder beneficiaries," filed a petition for declaratory judgment in the Superior Court of Fulton County. In the petition, Bates asked the trial court to declare that the Trust was valid and in full force and effect; that the transfers of the decedent's real and personal property to the Trust were valid, binding, and free from undue influence; that the statute of limitation period for challenging the validity of the Trust had expired; and that Howell had forfeited her distribution from the Trust by violating the Trust's "no contest" clause.[16]

---

[16] See *Howell*, 350 Ga. App. at 710.

11

The petition also asserted the wrongful restraint claim at issue in the instant appeal, which sought "actual damages arising from [ ] Howell's wrongful restraint on the Trustee's orderly administration of the Trust affairs." Regarding that claim, Bates alleged that Howell's TROs were wrongful because they were based solely on conclusory and unsupported allegations, were not founded on any legal claim for relief, and constituted an "unjustified attack on [Bates's] effort to sell a major trust asset[.]" In addition, Bates alleged the TROs were not based on any facts or evidence showing that Howell had a likelihood of success on the merits in the probate court proceeding, that the estate had or would have any claim to the Trust assets, that Howell had the legal authority to interfere with the administration of the Trust, or that the estate would be irreparably harmed if the TROs were not granted. The petition also asserted that the TROs were wrongful because Bates possessed the power and authority to dispose of the residence, either through a sale or by distributing it in kind to the charitable remainder beneficiaries; the TROs granted far broader relief than was necessary to accomplish their purported purposes (i.e., to prevent the disbursement of the sale proceeds to the charitable remainder beneficiaries); and the TROs improperly prevented him from fulfilling his fiduciary duties and his obligation to administer the Trust and to preserve the Trust's assets. According to Bates's

petition, the TROs not only jeopardized the sale of the Atlanta residence, they put the Trust at risk for breaching the sales agreement, caused the Trust to incur significant additional legal and closing costs due to the delayed closing, and jeopardized other assets of the Trust. Finally, Bates claimed that Howell's actions surrounding the issuance of the TROs, including improper statements she made to the title insurer prior to the closing, created an "irresponsible and unfounded uncertainty" that interfered with the closing on the sale. Bates's wrongful restraint claim sought compensation for the monetary damages suffered by the Trust during the period between the issuance of the first TRO on August 29, 2016, through the issuance of the Stipulated TRO on September 6, 2016.

In February 2018, the trial court granted partial summary judgment to Bates on the declaratory judgment claims in his petition, ruling that the Trust was valid and in full force and effect, that the statute of limitation period for challenging the validity of the Trust had expired in May 2015, and that Howell had forfeited her distribution from the Trust by violating the Trust's "no contest" clause.[17] Howell appealed the judgment, and this Court affirmed.[18]

---

[17] See *Howell*, 350 Ga. App. at 714 (2), 715 (3) (b).

[18] See id.

Following the trial court's grant of partial summary judgment to Bates, the only claim that remained pending in the trial court was the instant claim for wrongful restraint.[19] In March 2018, the parties submitted a consolidated, pretrial order on the wrongful restraint claim. Following a conference on the proposed order, the trial court notified the parties that it would determine, as a matter of law, whether Howell had wrongfully obtained the TROs and, thus, was liable for any resulting damages. If the court found Howell liable, a jury trial would be conducted to determine the amount of damages, if any.

On August 10, 2018, the parties filed cross-motions for summary judgment on the issue of Howell's liability. Following a hearing, the trial court denied Bates's motion for summary judgment and granted summary judgment to Howell. This appeal followed.

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as

---

[19] The trial court denied Howell's motion to stay the instant proceedings pending the outcome of the appeal in *Howell*, ruling that Bates's claim for monetary damages arising from the wrongful restraint were "independent and distinct" from the issues on appeal and that Bates and others would be prejudiced by a stay.

a matter of law. Moreover, on appeal from the denial or grant of summary judgment[,] the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[20]

With these guiding principles in mind, we turn now to Bates's specific claims of error.

1. Bates contends that the trial court erred in finding, as a matter of law, that the TRO and Revised TRO (collectively, "TROs") obtained by Howell did not constitute a wrongful restraint of the Trust and of Bates's ability to perform his duties as trustee. We agree.

OCGA § 9-11-65 (c) provides that, "[a]s a prerequisite to the issuance of a restraining order or an interlocutory injunction, the court may require the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been enjoined or restrained wrongfully."[21] "By authorizing a court to require the

---

[20] *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

[21] Compare OCGA § 9-11-65 (c), with Federal Rule of Civil Procedure ("FRCP") 65 (c) ("The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court

15

posting of a security bond, [OCGA § 9-11-65 (c)] recognizes that a party who is wrongfully restrained has the right to recover actual damages resulting from that wrongful restraint."[22] Thus, "[a]n applicant for a restraining order does so at its own peril because[,] if it succeeds in obtaining a restraint that is later determined to have been wrongful, then the wrongfully restrained party may recover actual damages caused by that restraint from the applicant."[23]

---

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.") (emphasis supplied). Although FRCP 65 (c) *requires* that the party seeking an injunction post a bond, unlike OCGA § 9-11-65 (c), "[b]ecause Georgia's Civil Practice Act is modeled on the Federal Rules of Civil Procedure, decisions of the federal courts interpreting the federal rules are persuasive authority." *Synovus Bank v. Peachtree Factory Ctr.*, 331 Ga. App. 628, 630, n. 2 (770 SE2d 887) (2015) (citation and punctuation omitted).

[22] *Hogan Mgmt. Svcs. v. Martino*, 242 Ga. App. 791, 794 (2) (530 SE2d 508) (2000) ("[A] trial court's decision under OCGA § 9-11-65 (c) to require the giving of a security bond is not a prerequisite to a wrongfully restrained party's right to recover damages. Rather, the posting of a security bond is simply a method by which the court may protect a wrongfully restrained party's rights by ensuring that there is a sum of money to pay any damages. Thus, a court's decision not to require the applicant to give a security bond simply means that a wrongfully restrained party will not have the protection of a secured source of money for its damages, but that decision does not automatically eliminate the applicant's peril that it might later be liable for damages caused by a wrongful restraint. The wrongfully restrained party will still have its right to recover damages; it just will not have a secured source of money from which to make its recovery.").

[23] Id. See *Cox v. Altus Healthcare & Hospice*, 308 Ga. App. 28, 32 (3) (706 SE2d 660) (2011) (holding that, because the confidentiality agreement that was

"A party has been 'wrongfully enjoined' . . . if it is ultimately found that the enjoined party had at all times the right to do the enjoined act."[24] "The focus of the 'wrongfulness' inquiry is whether, in hindsight in light of the ultimate decision on the merits after a full hearing, the injunction should not have issued in the first instance."[25] To recover damages based on a wrongful restraint, "a party must prove that it was wrongfully enjoined and that its damages were proximately caused by the erroneously issued injunction."[26]

(a) Bates argues that the TROs wrongfully restrained him from selling the Atlanta residence, using the sale proceeds and other Trust assets to pay expenses, and performing his other duties as trustee, because, at all times following the decedent's death, the Trust empowered him to perform these acts.

---

enforced against the appellant was illegal, then the restraint imposed by the agreement was wrongful, and he could recover any damages he suffered during the period of the injunction's enforcement).

[24] *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith*, 910 F2d 1049, 1054 (II) (2nd Cir. 1990) (addressing a wrongful restraint claim brought under FRCP 65 (c)).

[25] Id.

[26] *Milan Express v. Averitt Express*, 254 F3d 966, 981 (III) (A) (11th Cir. 2001).

It is undisputed that, in the three and one half years that Bates served as trustee, Howell never asserted a challenge to Bates's actions as trustee, sought to remove him, or asserted any claim against the Trust assets. Although Howell eventually challenged the validity of the Trust in her answer to Bates's November 2016 declaratory judgment action, the trial court ruled that the time period for Howell to challenge the validity of the Trust had expired and that the Trust was valid and in full force and effect, and this Court affirmed those rulings.[27] It necessarily follows that the TROs wrongfully restrained Bates from performing acts that he was legally permitted (even required) to do.[28]

Moreover, even if Howell had had the authority and a valid legal basis[29] to obtain a TRO to prevent Bates from distributing the sale proceeds to the charitable remainder beneficiaries, the TROs included much greater restraints, completely prohibiting Bates from making *any* disbursements from the Trust for *any* reason, including to pay the Trust's usual and necessary expenses. Thus, the TROs were

---

[27] See *Howell*, 350 Ga. App. at 714 (2).

[28] See *Blumenthal*, 910 F2d at 1054 (II).

[29] See Division 1 (b), infra.

overbroad and unnecessarily infringed on Bates's ability to manage the Trust according to its terms.[30]

(b) Bates also correctly points out that Howell had no legal basis for freezing the Trust assets and interfering with his administration of the Trust and, thus, Howell is liable for the monetary damages that resulted from the wrongful restraints imposed by the TROs.

As shown above, Howell personally had no claim to any of the Trust's assets, because she had forfeited her right to a distribution from the Trust by violating the Trust's no contest clause.[31]

Further, when she petitioned for the first TRO, Howell asserted that she had challenged the decedent's Will in the probate court and was seeking the TRO as the "Proposed Administrator" of the decedent's estate. Yet, at that time, the probate court had not declared the decedent's Will, or any provision thereof, invalid, and the Will specifically nominated Bates to serve as the executor of the estate.[32] Consequently,

---

[30] See *Hogan Mgmt. Svcs.*, 242 Ga. App. at 795 (2).

[31] See *Howell*, 350 Ga. App. at 715 (3) (b).

[32] Moreover, even if Howell successfully had Bates removed as executor of the Will, the Will nominated a successor executor, Wells Fargo Bank, N. A., to serve as executor if Bates became unable or was unwilling to serve.

19

Howell clearly lacked the authority at that time to take any actions or pursue any claims on behalf of the estate.

In addition, the pending probate court proceeding only involved Howell's challenge to the validity of the Will and to Bates's service as the Will's executor. Howell never challenged the validity of the Trust or Bates's service as the trustee in the probate court proceeding.[33] It follows that, to the extent Howell argues that, at the time she petitioned for the first TRO, a "question" regarding Bates's "ability to serve" as the trustee of the Trust was being adjudicated in the probate court, that argument lacks merit.

Moreover, in her petition for the first TRO, Howell asserted that the TRO was necessary to prevent Bates from distributing the sale proceeds and other Trust assets to the charitable remainder beneficiaries because, if and when the probate court appointed her as the administrator of the estate, she intended to assert, on behalf of the estate,[34] certain causes of action against Bates based on his behavior during the

_____

[33] The issue of whether the probate court would have had subject matter jurisdiction over any challenges involving the Trust is not before this Court in this appeal.

[34] As noted in *Howell*, it is unclear whether the estate still has the capacity to assert any claims against anyone, given that
the Assignment that was executed on the same day as the Will and Trust

decedent's lifetime (e.g., undue influence, legal malpractice, etc.). However, even if the probate court ruled that the Will was invalid and appointed Howell to serve as the estate's administrator at some point in the future, Howell would have to assert her intended causes of action against Bates *personally* or in his capacity as the decedent's *lawyer*, *not* in his capacity as trustee of the Trust. Indeed, Howell could not assert the estate's claims against Bates in his capacity as *either* the trustee of the Trust or the executor of the Will, because the improper acts alleged by Howell were committed before the decedent died, when Bates was *neither* the trustee (because the decedent remained the trustee until her death), nor the executor of the Will (because the estate did not yet exist, given that the decedent was still alive). And, even if Howell prevailed on those claims, the Will expressly prohibits her from collecting on any such judgment from the estate, and Howell has cited to no provision in either the Will or the Trust by which she would be entitled to collect such judgment from the Trust's assets.

------

transferred to the Trust all of the estate's lawsuits and claims, including those that might arise in the future, for all amounts "which may potentially be payable to the estate[.]" This presents an issue as to whether the estate still has the capacity to assert any claims against the Trust and/or Bates.

350 Ga. App. at 712 (1), n. 15. As in *Howell*, that issue is not before this Court in this appeal. See id.

Finally, although the decedent's Will added some assets to the Trust upon her death,[35] the Will did not *create* the Trust; instead, the decedent executed the Will and Trust separately, and they were distinct and independent from one another, as was the Assignment executed by the decedent. Thus, even if the probate court ruled that the Will was invalid, that determination would not automatically render the Trust invalid, nor would it necessarily affect the validity of the inter vivos transfer of the majority of the decedent's assets (including the Atlanta residence) to the Trust through the Assignment.

Accordingly, we hold that Bates has met his burden of demonstrating by the record that Howell lacked the authority to obtain the TROs in this case and that the TROs wrongfully restrained him from fulfilling his mandatory and/or discretionary duties as trustee of the Trust.

(c) Bates contends that there is no merit to Howell's argument that he waived his right to challenge the propriety of the TROs. We agree.

---

[35] As shown above, when the decedent executed the Assignment in February 2013, about two months before she died, she immediately and irrevocably transferred all of her assets to the Trust. Only the assets she acquired shortly before her death were transferred to the Trust through her Will.

[B]ecause waiver is not favored under the law, the evidence relied upon to prove a waiver must be so clearly indicative of an intent to relinquish a then known particular right or benefit as to exclude any other reasonable explanation. Indeed, all the attendant facts, taken together, must amount to an intentional relinquishment of a known right, in order that a waiver may exist. The burden of proof lies with the party asserting waiver and, although generally a jury question, when the facts and circumstances essential to the waiver issue are clearly established, waiver becomes a question of law.[36]

According to Howell, in the Stipulated TRO, Bates consented to the same restrictions that were in the Revised TRO and, thus, he waived any claim that the TRO and Revised TRO were wrongful. As shown above, however, the record clearly shows that, unlike the Stipulated TRO, both the TRO and the Revised TRO prohibited Bates from making any disbursements from the Trust (or the sale proceeds in the court's registry) for any purpose other than to finalize the closing of the sale of the residence, and those additional restrictions prevented Bates from managing the Trust according to its terms.

Further, in his challenges to the TROs, and in the Stipulated TRO, Bates consistently and explicitly reserved his right to recover actual damages resulting from

---

[36] *Vratsinas Constr. Co. v. Triad Drywall*, 321 Ga. App. 451, 454 (1) (739 SE2d 493) (2013) (punctuation and footnotes omitted).

Howell's improper actions in obtaining the TROs. And, from August 29, 2016, until the closing on September 6, 2016, Bates repeatedly warned Howell that her improper ex parte TROs were causing the Trust to incur substantial additional and unnecessary costs and that he would hold Howell responsible for all damages to the Trust that were caused by the TROs.

Consequently, the record clearly does not support a finding that Bates waived this wrongful restraint claim.[37]

In sum, we hold that the trial court erred in granting summary judgment to Howell and denying Bates's cross-motion for summary judgment on the issue of whether the TROs constituted a wrongful restraint on the Trust and on Howell's liability for damages arising as a result of the improper TROs. The only remaining issue to be decided on remand is the amount of actual damages, if any, incurred by the Trust for which Howell is liable.[38]

---

[37] See *Vratsinas Constr. Co.*, 321 Ga. App. at 454 (1).

[38] See *Hogan Mgmt. Svcs.*, 242 Ga. App. at 794 (2); see also *Milan Express*, 254 F3d at 981 (III) (A).

2. In light of our decision in Division 1, supra, Bates's argument that Howell failed to provide the requisite statutory notice[39] to him prior to obtaining the first TRO is moot.

*Judgment reversed, and case remanded with direction. Miller, P. J., and Rickman, J., concur.*

---

[39] See OCGA § 9-11-65 (a) ("No interlocutory injunction shall be issued without notice to the adverse party."). But see OCGA § 9-11-65 (b) ("A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if: (1) It clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and (2) The applicant's attorney certifies to the court, in writing, the efforts, if any, which have been made to give the notice and the reasons supporting the party's claim that notice should not be required.").